# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

PETER C. JENSEN,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. C07-3036-PAZ

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the court for judicial review of the defendant's decision denying the plaintiff's applications for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act. The plaintiff Peter Jensen filed his applications on April 18, 2003,[1] alleging his disability began on January 31, 2000. Jensen claims he is disabled due to a mental impairment and low back pain.

Jensen's applications were denied initially and on reconsideration. He requested a hearing, and a hearing was held on February 28, 2006, before Administrative Law Judge ("ALJ") Thomas M. Donahue. Jensen was represented at the hearing by attorney F. David Eastman. Jensen testified at the hearing, and Vocational Expert ("VE") Julie Svec also testified. On August 18, 2006, the ALJ held that although Jensen cannot return to any of his past work, he nevertheless is able to perform other work that exists in significant numbers in the national economy. The ALJ therefore held Jensen is not disabled. Jensen appealed the ALJ's decision, and on April 3, 2007, the Appeals Council

---

[1] Jensen previously filed for disability benefits on four occasions, most recently on March 21, 2000. These applications all were denied initially on June 23, 2000, with no further appeals.

denied his request for review, making the ALJ's decision the final decision of the Commissioner.

Jensen filed a timely Complaint in this court seeking judicial review of the ALJ's ruling. On August 6, 2007, with the parties' consent, Judge Donald E. O'Brien transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The issue before the court is whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). Here, Jensen argues the ALJ erred in failing to give proper weight to the opinions of Jensen's treating physician regarding his functional limitations, and in failing to find Jensen's subjective complaints regarding the degree of his limitations to be credible. He argues the record does not contain substantial evidence to support the ALJ's conclusion that he is not disabled.

The ALJ found that "no new and material evidence was presented to warrant reopening of the previous denials." R. 17. Because Jensen's insured status under Title II expired on June 30, 2003, the relevant time period for consideration of Jensen's DI claim is from June 24, 2000 - the day after his earlier applications for benefits were denied - through June 30, 2003. The relevant time period for consideration of his SSI claim is from April 18, 2003 - the date of his application - through August 18, 2006 - the date of the ALJ decision.

Jensen was 45 years old at the time of the ALJ hearing. He lived with his wife and two sons. His wife and one of his sons were receiving Social Security benefits. Jensen attended school to the twelfth grade, but he was in special education classes in all of his subjects.

Jensen's most recent employment was in 1998, when he ran heavy equipment for a windmill construction company for about four or five months. During that job, he had a number of disagreements with his coworkers, and after two of those disagreements, he quit but was persuaded by the company to return. His employment concluded when the project was finished. Jensen testified the job did not require much lifting, but he would no longer be able to do the job because the "bouncing around" hurts his back. According to Jensen, the four or five months he worked for the windmill construction company is the longest he has held a job. He left every other job after working for only a short period of time because of frustration or anger.

Before he worked for the windmill construction company, Jensen operated a tractor on a family farm. He also helped his friends with odd jobs on construction projects. He once helped a friend operate a bar, and he sometimes tinkered with cars. None of these was a full-time job. The heaviest lifting he has done was forty or fifty pounds.

Jensen spends most of his time laying around his home watching television. He has trouble sleeping. He will get eight hours of sleep per day, but not consecutively. After going to bed, he will sleep for four hours, be up for the rest of the night, and then sleep some more during the day.

Throughout his life, Jensen has been told he has psychological problems. He gets depressed, and just sits in the corner and "clams up." Sometimes he has crying spells, and at other times he yells and screams at people. He has only a minimal ability to read. He cannot read a newspaper or simple directions. He can barely add or subtract, and cannot

do multiplication or division. He has tried vocational rehabilitation counseling, but he never followed through because he "got frustrated and left."

Jensen has had back surgery twice, but he still has constant pain in his lower back. It hurts when he is sitting, walking, running, or jumping. When he is sitting, he has to readjust every five minutes or so. Even if he is allowed to move around in his chair, he can only sit for fifteen or twenty minutes before he has to get up and walk around.

Jensen was asked the following question by his lawyer:

> [I]f you had a job where you could sit or stand if you choose, didn't have any lifting involved, didn't have to do anything hard, had very little contact with the supervisor and didn't require a great deal of training or anything, just teaching you how to maybe put something together or something like that, could you do that work?

Jensen answered, "No." He explained that would "be just like other jobs. I'm told what to do with a tractor, and I go off and do it and I just get frustrated and walk off the job."

Jensen testified that since a drunk-driving conviction in about 1995, he no longer drinks. He admitted he had been convicted of marijuana possession eighteen years earlier, but stated he quit after the conviction because he "learned [his] lesson." He smokes from a pack to a pack-and-a-half of cigarettes a day.

At the time of the ALJ hearing, Jensen was taking OxyContin, Risperdal, Triliptol, and Trazodone. He testified he was seeing Dr. Armstrong, a psychiatrist, about once a month. Dr. Armstrong talks with Jensen and prescribes medication. At the time of the hearing, Jensen was not seeing a doctor for his back. He testified he "was learning to live with the pain." On one occasion, he attempted to see a neurosurgeon, Dr. Beck, but he was turned away because he did not have insurance.

The ALJ asked the VE the following hypothetical question:

> First one being age 45, male, twelfth grade education, past relevant work set forth in Exhibit 22E. Lifting up to 30 pounds occasionally, 15 pounds frequently. . . . Sitting and

4

> standing up to two hours at a time for at least six out of an eight-hour day. Walking four blocks. Only occasional climbing of ramps and stairs. Only occasional balancing, stooping, kneeling, crouching, crawling and bending. Would need a low stress level job such as a level four with 10 being the most stressful and one being the least stressful. Due to problems with concentration would be limited to simple, routine tasks. And because of problems around people the claimant would be limited to no contact with the general public and limited contact with fellow workers. Could the claimant do any of his past relevant work under this hypothetical?

The VE responded, "it appears that the job as a construction drive[r] as described by the claimant would continue to be possible." According to the VE, this claimant also could work as a folder, a bottle packer, and a delivery driver.

The ALJ asked the VE the following additional hypothetical:

> The second hypothetical would be age 45, male, twelfth grade education, special ed. Past relevant work set forth in Exhibit 22E with the exception of the bartender job. Sitting and standing up to two hours at a time for six of an eight-hour day. Walking up to four blocks. Only occasional climbing of ramps and stairs. Only occasional balancing, stooping, kneeling, crouching, crawling, bending. Would require a low stress level job. . . . Would be limited to simple, routine tasks. Require a job with no contact with the general public and limited contact with fellow workers. Due to chronic pain syndrome, depression, mental impairment or any other reason the claimant would miss three or more days of work per month. Can he do his past relevant work under this hypothetical?

The VE answered, "No." The VE also testified this hypothetical claimant would not have any transferable skills, and would not be able to perform unskilled work.

In response to questions by Jensen's attorney, the VE stated that under the first hypothetical, if the claimant could not climb, bend, stoop, kneel, crouch, or crawl, he

5

would not be able to perform the construction driver or delivery driver positions, but he could work as a folder or bottle packer.

On January 24, 2001, Jensen saw David W. Beck, M.D., a neurosurgeon, complaining of excruciating left leg pain. Dr. Beck diagnosed a herniated disk at L4-5. On January 26, 2001, Dr. Beck performed a diskectomy. Jensen did well postoperatively, and was discharged on January 27, 2001. According to Dr. Beck, Jensen's "leg was all better." Jensen saw Dr. Beck for a follow-up on February 5, 2001, and reported his leg felt fine. He did not return.

On October 11, 2001, Jensen saw Donald C. Berge, M.D., a doctor from Mercy Family Clinic, complaining of low back muscle spasms. He reported he had been shingling, and his back was "killing him." Dr. Berge prescribed Ultram and Oxazepam, and gave Jensen Doxepin to help him sleep. Jensen failed to show up for a medication check on March 21, 2002, but he saw Dr. Berge on April 8, 2002, complaining of sleep problems. His wife told the doctor that until recently, "things were going pretty well but he has been just a little more explosive and anxious lately." Dr. Berge prescribed Oxazepam and Zoloft. On July 19, 2002, Jensen called Dr. Berge's office and stated he was "at wit's end." He was having financial trouble, and could not afford the medicine for his wife's multiple sclerosis. He could not get a job "because of his record," and he had "been having a short fuse." Dr. Berge increased the dosage of Jensen's Oxazepam.

On November 21, 2002, Jensen saw Brent E. Brunsting, M.D., another doctor at Mercy Family Clinic, and asked to discuss his medications. He also wanted help for depression, although he did not want to see a psychiatrist or counselor. Dr. Brunsting noted mild agitation, appropriate thought content, and fair insight. On December 4, 2002, Jensen saw Dr. Brunsting again, and reported some improvement. His wife confirmed that things had improved significantly.

6

On June 2, 2003, Mark D. Dankle, D.O. conducted a Disability Determination Examination of Jensen. He noted a history of chronic low back pain dating to an injury in 1996, a diskectomy in 1993, and a second diskectomy in January 2001. Jensen complained of persisting low-back pain radiating down both legs, with associated numbness and weakness in his legs. He stated the pain was aggravated by prolonged standing, walking, and sitting. He reported that he had been given a twenty-five to thirty-pound lifting restriction. He also complained of chronic foot pain. He stated he smoked one pack of cigarettes per day, and he smoked marijuana occasionally. On examination, Dr. Dankle noticed tenderness at the lumbosacral junction, with some increased muscle tone in the lumbar spine. Straight leg raising was negative bilaterally. Jensen had mildly decreased range of motion due to pain and stiffness, and difficulty walking on his tiptoes and heels. He was able to squat. Dr. Dankle recommended that Jensen avoid heavy lifting and frequent bending. He should stand, walk, and sit at his tolerance, and likely would need to be able to change positions on a regular basis. He should avoid stooping, climbing, kneeling, or crawling. He had no limitations in regards to handling objects, seeing, hearing, speaking, traveling, or work environment.

On June 26, 2003, Jensen saw Dr. Brunsting for a follow-up. Jensen stated his medications were helping him significantly, although he had gained a considerable amount of weight. Also, his mood was still up and down, and he had some focus problems.

On July 11, 2003, upon referral from Dr. Brunsting, Jensen saw Brent Seaton, Ph.D. for a neuropsychological evaluation. Dr. Seaton diagnosed Jensen as suffering from moderate bipolar disorder and attention deficit/hyperactivity disorder. He assigned Jensen a GAF of 52. He recommended that Jensen stop using marijuana. In a letter to Dr. Brunsting dated September 4, 2003, Dr. Seaton stated he had conducted a lengthy interview with Jensen and his wife, and Jensen had completed a brief battery of neuropsychological tests to assist in diagnostic clarification. He concluded that Jensen was

7

suffering from comorbid ADHD and bipolar disorder. He recommended that Jensen stop using marijuana, and suggested he might respond to Wellbutrin in addition to his mood stabilizers. In a letter to the state agency dated October 1, 2003, Dr. Seaton stated Jensen's prognosis was "guarded because of the complex nature of his diagnostic presentation." He concluded Jensen would have mild to moderate difficulties at work with respect to recalling and understanding instructions, procedures, and locations. He would require repetition, and might have difficulty with multiple-step commands. He would be prone to lapses in concentration and difficulties with sticking to the task at hand. He would have problems relating to people in positions of authority, and have the potential for unexpected and impulsive behavior. He was not likely to do well with changes in his routine, and might require a higher level of structure than is typical.

Steven B. Mayhew, Ph.D. conducted a psychodiagnostic disability assessment of Jensen on September 16, 2003. The presenting clinical problem was "increased irritability, chronic problems with attention, and poor reading." He diagnosed Jensen as suffering from manic bipolar disorder and past history of problems with ADHD. He concluded:

> [Jensen's] capacity to understand, retain, and follow work-related instructions and procedures is considered moderately impaired and would likely require ongoing monitoring or supervision. Sustained attention, concentration, and reasonable pace at entry-level work-like tasks is estimated to be moderately limited. Monitoring by work supervisors would likely be necessary. His capacity to interact appropriately with supervisors, co-workers, and the general public is considered impaired. Taking instructions or working successfully with others is considered unlikely. Peter's capacity to tolerate stress and pressure of simple, unskilled work, and to respond appropriately is estimated to be markedly limited. Exercising reasonable judgment or tolerating stress in the work-place appears unlikely.

Jensen saw Dr. Brunsting again on September 22, 2003, complaining about his mental health, but when Dr. Brunsting suggested he see a psychiatrist, Jensen became "adamant and angry," and stated they are all "quacks."

On January 6, 2004, Dr. Dankle performed a second Disability Determination Examination of Jensen. Dr. Dankle's physical findings were essentially the same as in his June 2, 2003, examination, but he added the following comment to his report: "I am not a psychiatrist, however, I have the opinion that he is 100% disabled with his psychiatric condition."

On January 26, 2004, Jensen saw Dr. Brunsting for a prescription refill. He stated he was sleeping fairly well, but he had too much energy some of the time and had trouble focusing. His only physical complaint was some mild back discomfort from playing with his children. He saw Dr. Brunsting again on February 23, 2004. Dr. Brunsting noted that Jensen's medications were helping, without side effects, but he was under stress with family problems. Dr. Brunsting stated, "He does not feel that he needs any counseling and absolutely refuses going to a psychiatrist despite my urging and discussion of the importance of getting this complicated situation under control." Jensen called Dr. Brunsting's office on March 30, 2004, and requested an increase in his medications. On May 20, 2004, Jensen saw Dr. Brunsting and reported that he had stopped taking his medications. He requested a prescription for something he had seen on the Internet, but Dr. Brunsting refused.

In August 2004, Jensen saw a psychiatrist, Dale Armstrong, M.D., who adjusted his medications, and Jensen felt this helped somewhat. On November 18, 2004, Jensen reported to Dr. Brunsting that he was "doing fairly good." Jensen stated his mood had been more stabilized, and he was sleeping well. Dr. Brunsting determined the following after examining Jensen's back:

> He has a positive straight leg raising sign on the left side. There is tenderness in the paraspinous musculature on the left

9

> and a well-healed surgical scar is noted. Pulse, capillary refill, motor, and sensory function of the extremity is fine. There is a decrease of deep tendon reflex in the knee jerk area on the left side compared to the right side.

In a letter to Dr. Brunsting dated June 22, 2004, Dr. Armstrong stated the following:

> I appreciate your referral of Peter Jensen. As you know, this is a very complex psychiatric case. He has been under psychiatric care since the age of four years. He has seen multiple care providers. Most recently he was treated by Ronald Larsen, MD. He has a very rough exterior and tends to alienate people. He has a profound history of substance abuse with a strong axis II component, primarily antisocial. This is a very difficult population to treat. The prognosis for significant improvement, unfortunately, is not good.
>
> I have started him on Depakote ER. I am titrating him up to 1000 mg. I will get a level in two weeks and then reassess. I have increased the Trazodone to 100 mg. I have discontinued the Paxil. I have left the Oxazepam be. I will see him back for followup in three weeks.

Jensen apparently saw Dr. Armstrong regularly from January 17, 2005, to February 1, 2006, but the records of those visits are mostly illegible. In a letter to Jensen's attorney dated March 28, 2007, Dr. Armstrong stated, "I am sorry you had trouble reading my notes." He then stated, "The prognosis for significant improvement is not good. He has been on multiple psychiatric medications. He is clearly very impaired and the likelihood that he would miss at least three or more days of work a month is high. I do believe he is disabled, from a psychiatric standpoint."

The ALJ found Jensen met the insured status requirements of the Social Security Act through June 30, 2003, and had not engaged in substantial gainful activity since January 31, 2000, his alleged disability onset date. According to the ALJ, Jensen has the following severe impairments: "back impairments, bipolar disorder and a history of

attention deficit hyperactivity disorder." He noted that the evidence reflected "a past back injury without any recent treatment." In fact, Jensen has not sought continuing treatment for his back since February 2001, and he has not complained to a doctor about any significant back pain since 2003. The ALJ summarized the results of Dr. Dankle's Disability Determination Examinations on June 2, 2003, and January 6, 2004.

The ALJ summarized Dr. Seaton's neuropsychological evaluation of July 11, 2003, and Dr. Mayhew's psychological evaluation of September 16, 2003. He also noted that Dr. Dankle, in his report of January 6, 2004, after acknowledging he was not a psychiatrist, stated he believed Jensen was 100% disabled because of his psychiatric condition. In January 2005, Jensen began seeing a psychiatrist, Dr. Armstrong. According to the ALJ, his records were difficult to read, but they "continue to report improvement with medical management."

The ALJ noted Jensen's testimony that he stopped using marijuana eighteen years earlier was contradicted by statements he made to his doctors about his continued self-medication with marijuana.

The ALJ found that Jensen's impairments did not meet or equal the listed impairments. He found that although Jensen is unable to perform any past relevant work, he can perform jobs that exist in significant numbers in the national economy.

The ALJ found that Jensen has the following residual functional capacity:

> [L]ifting or carrying 15 pounds frequently and 30 pounds occasionally, sitting about 2 hours at a time for approximately 6 hours in an 8 hour work day, and standing about 2 hours at a time for approximately 6 hours in an 8 hour work day with the ability to walk 4 blocks. He is restricted to occasional climbing, balancing stooping, kneeling, crouching, crawling or bending. Mental limitations include low stress, routine tasks that would require no contact with the general public and limited contact with fellow workers.

The ALJ's findings regarding Jensen's capacity for physical work are fully supported by substantial evidence in the record. However, his findings regarding Jensen's mental limitations are not similarly supported.

On July 11, 2003, Dr. Seaton diagnosed Jensen as suffering from comorbid ADHD and bipolar disorder. He assigned Jensen a GAF of 52. He concluded that Jensen's prognosis was guarded, and his mental condition would present mild to moderate difficulties at work with respect to recalling and understanding instructions, procedures, and locations. He also indicated Jensen would have problems relating to people in positions of authority, would have the potential for unexpected and impulsive behavior, and was not likely to do well with changes in his routine.[2]

On September 16, 2003, Dr. Mayhew diagnosed Jensen as suffering from manic bipolar disorder and past history of problems with ADHD. He concluded Jensen's capacity to understand, retain, and follow work-related instructions and procedures was moderately impaired, and he likely would require ongoing monitoring or supervision. Sustained attention, concentration, and reasonable pace at entry-level work-like tasks was moderately limited. His capacity to interact appropriately with supervisors, co-workers, and the general public was impaired. He was unlikely to take instructions or work successfully with others. His capacity to tolerate the stress and pressure of simple, unskilled work, and to respond appropriately, was markedly limited. He was unlikely to exercise reasonable judgment or tolerate stress in the workplace.

Jensen began seeing Dr. Armstrong in June 2004. Despite some improvement from adjustments to Jensen's medications, Dr. Armstrong found Jensen's prognosis to be poor, and he opined Jensen is "clearly very impaired" and "disabled, from a psychiatric standpoint." Although the ultimate determination regarding whether a claimant is disabled

---

[2]Dr. Seaton wrote two reports based on a single examination of Jensen, one dated September 4, 2003, to Dr. Brunsting, and one dated October 1, 2003, to the state agency. The ALJ mistakenly indicated Dr. Seaton had examined Jensen twice.

is reserved for the Commissioner, *see Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2007) (citing *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)), as Jensen's treating physician, Dr. Armstrong's opinions regarding Jensen's level of impairment nevertheless are entitled to significant weight. *See Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000).

Notably, the ALJ did not have the benefit of Dr. Armstrong's opinion before him at the time of his decision. However, as the Commissioner acknowledges in his brief, Jensen submitted Dr. Armstrong's opinions to the Appeals Council, and the Appeals Council considered the newly-submitted evidence. In those circumstances, courts in the Eighth Circuit are charged with the duty to "decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." *Kitts v Apfel*, 204 F.3d 785, 786 (8th Cir. 2000); *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995). The court finds that Dr. Armstrong's conclusions are consistent with his treatment notes and other substantial evidence in the record. Giving Dr. Armstrong's opinions the weight to which they are entitled, and considering the record as a whole, the court finds substantial evidence supports a conclusion that Jensen is disabled due to his mental impairments.

The remaining question is when Jensen's disability began. Jensen's first definitive diagnosis was made by Dr. Seaton, on July 11, 2003, when the doctor diagnosed Jensen with bipolar disorder and comorbid ADHD. As the Eighth Circuit has observed, mental impairments "usually do not occur overnight," *Culbertson v. Shalala*, 30 F.3d 934, 939 n.4 (8th Cir. 1994), and Jensen clearly had difficulties due to mental impairments prior to July 2003. However, for purposes of determining his disability onset date, Jensen has failed to meet his burden to come forward with evidence establishing that he was disabled due to his mental impairments prior to that time. The court finds that for purposes of Jensen's claims for benefits, his disability began on July 11, 2003. As a result, Jensen has

failed to show he was disabled prior to the expiration of his insured status for purposes of his Title II claim for DI benefits. However, he has shown he was disabled while his application for Title XVI benefits was pending.

Accordingly, the Commissioner's decision is **affirmed in part and reversed in part**. The decision is **affirmed** with regard to the Commissioner's decision denying Jensen's application for Title II benefits, and **reversed** with regard to his application for Title XVI benefits. The case is **remanded** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of Title XVI benefits with a disability onset date of July 11, 2003.

**IT IS SO ORDERED.**

**DATED** this 30th day of July, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT